Good morning everyone. Before we actually start our arguments, Judge Abe and I would like to thank and acknowledge Judge Lynn Adelman from the Eastern District of Wisconsin. He's here visiting with us for a few days and we're very appreciative of his willingness to take time from his work to help us out. So thank you, Judge Adelman. Thank you. Nice to be here. Okay, our first case for argument, let's see, let me preliminarily note that Heller v. Saul and Sata v. Martin are both submitted on the briefs and records. So our first case for argument is Stoddard-Nunez v. Hayward. Good morning, Your Honor. I'd like to actually reserve five minutes for rebuttal. Sure. Good morning, and if it pleases the Court, this Court should reverse the district court's grant of summary judgment because the district court was wrong. Could you please state your name and who you're appearing for? I'm sorry, Your Honor. Adante Pointer on behalf of the appellant. Now, the district court got the case wrong. The district court essentially resolved material fact disputes that would have precluded the district court granting summary judgment on the defendant's behalf because there were ample facts in the record that were in dispute that contradicted or undermined the defendant's story and there were ample facts in the record that were set forth by the plaintiff appellant that shows that the car was not an immediate threat at the time deadly force was applied as well as there's ample facts in the record that show that there was pre-shooting negligent conduct that the defendant engaged in as well as if the defendant failed to issue a warning when it was reasonable to do so under the circumstances. We also believe that, and the Court has provided the recent case of Orne, but it was also stated in previous case law that it is unreasonable for an officer to use deadly force at a slow-moving vehicle, a slow-moving vehicle that the officer could easily step back from and that a slow-moving vehicle wherein prior to the shooting or to the use of deadly force taking place had not advanced or made any movements to threaten the officers. And so in this case at Barr where we had the driver of the Honda, the driver of the Honda had not vocalized any threats towards the officer. The driver of the Honda had in fact been driving the Honda in such a way that was essentially a pretty slow speed pursuit and the officer had not even used his lights, sirens or any of that to announce his presence. And so when you have the Honda leaving the parking lot, the Honda is going straight. And this is an important fact because the District Court tried to resolve this dispute. The District Court said that the Honda was driving at the officer and the patrol car. Let me put this in perspective, I think. Yes. So as I understand what the District Court did was on the claim of a constitutional violation, the District Court basically entered judgment on the merits for the defendants. That is, she said nobody could find a constitutional violation on these facts. Yes. But even if she found the officer was entitled to qualified immunity, is that right? Yes. But she then entered judgment. So your remarks now, I gather, are going to the first prong, which is she erred because there are genuine tribal material issues of fact on the constitutional claim. Yes, Your Honor. Is that your position? That is our position as well as to say that the case law made it such that the officer was on notice. Right. So you've got to do this logically. So if you say there's tribal issues of fact, okay, so we also then still have to then move on to the District Court's determination that the officer was entitled to qualified immunity. For that determination, you have to take the facts in the light most favorable to your client. Yes, Your Honor. You were the non-moving party, right? Yes, Your Honor. Okay. So now the recent case that we alerted you to sort of deals with that part of the analysis. Yes, it does. Right? Yes, it does, Your Honor. So what was the case law that made it clear to a reasonable officer under these kinds of facts, taking these facts in the light most favorable to your client, that he would have known that firing nine shots at this vehicle exiting the parking lot would violate the person's constitutional rights? Yes, Your Honor. Well, victim's constitutional rights. Yes. So we cite in our brief several cases, some of which out of this circuit and from other circuits around the country, I believe seven different circuits, where it was essentially stated that an officer who fires into a slow-moving car, a car that is not threatening the officer at that time or threatening the public, a car that has not been taken on a high-speed pursuit where it's threatening the general public, that it's unreasonable for an officer to use deadly force in that situation. And that's the Adams case, Acosta case, and the Mullenix case. Okay. Now let me ask you this. If you take the facts, your client's version of the facts, what do they establish with respect to whether or not the car was slow-moving as it exited? Sure. First we look at the officer's claims as well as the ride-along. The officer claims that in a span of what he says was two seconds, but we know it was about 12 seconds, the car proceeded out in the direction of the driveway and onto the street. The officer was at the patrol car's passenger side door. He claims that he managed to not only push the ride-along in, close the door, back up, fire nine shots while still being able to maintain his position in front of the car. So the officer's ability to move that amount of to do those things in a short amount of distance places him in a relative, makes the car to have been moving at a much slower rate than even the officer, for the officer to be able to maintain his ability to be in front of the car. Well, let me ask you this. Was he ever in a position in front of the car? In front of the Honda? Yes. There was a point in time where he was in front of the Honda, because given the Honda was driving out of the driveway and the patrol car was placed on half of the driveway, the Honda was coming in the direction of Fletcher Lane. I didn't think it was your contention that he fired all the shots when he was standing in front of the Honda. It's not, Your Honor. And if I misspoke, I apologize. What I was saying or what I was responding to was there was a point in time where the officer, just given the relative position of the Honda and the patrol car, that he was in front of the Honda, but he was not firing until after, according to the ride-along, there had been some contact with the door. The ride-along was on the passenger seat of the patrol car, and then he said he heard shots. So that places, when you take that testimony along with the officer saying that he was next to the ride-along and he started firing at her about the time he heard or he pushed the ride-along into the car or attempted to, then that places the car directly parallel to the officer. And then when you add that to the photographic evidence, the physical evidence that shows that there's bullets in the car, in the back passenger door, as well as one particular bullet that's fired into the door and it looks like it's going from back to front in the car, that shows that the officer continued firing, not only when he was parallel to the car, but after the car had went beyond him. And then you add on top of that that there was an Alameda County coroner's inspector who came to the scene and took the city's position as relates to what took place. And in that report, it says that the officer continued to fire after the car had proceeded to drive down Fletcher Lane. And in addition, when you look at the video, which is not the best video, but it is a critical piece of evidence, because if you look at the video, you can see the muzzle shots as well as the headlights of the car. Now, when did this incident take place? This incident took place March 3rd of 2013. And when was ACOSTA decided? When was the what? ACOSTA. Oh, ACOSTA was, sorry, I believe it was before, I don't have the exact date right now, but I do understand that ORN took place in 2011, which would have been before this incident that took place, which also would have placed. Oh, but the ORN opinion just came out, so it wasn't available to the officers at the time of this incident. Wasn't ACOSTA 1996? It very well may have been. But ACOSTA, ORN cites to many of the same cases that we have talked about in our own brief in terms of. ORN says that it's clearly established as a result of ACOSTA back in 1996. Yes, and so that's the foundation that ORN is essentially built upon. So that, ACOSTA essentially put the officer on notice that the type of conduct that he engaged in here in this case is unreasonable and unconstitutional. Okay, let me ask you, let me go back now to the first prong, which is the constitutional claim. Yes. And you start off by saying there are tribal issues of fact. Yes, Your Honor. Could you give me an example of one or two material tribal issues of fact that the jury must resolve to determine whether or not there was excessive force under the Fourth Amendment? Sure. It's plaintiff's position that the Honda was merely driving towards the driveway and would have proceeded out the parking lot without striking the car or placing the ride-along or the defendant officer in immediate danger. Conversely, the defendant's claim that, defendant Troche, the officer claims that the car was going straight, and he only fired or used deadly force because the car veered into the patrol car in the ride-along, and the defendants then state that when that took place, the ride-along was hit by the door. The defendants then offer evidence saying that there was much damage to the door and that this car was coming at a fast rate of speed. But if you take a look in which the physical evidence undermines that, the door had very little damage to it, if any at all. There was no ability to tie down, if you will, the supposed scrape along the door. And just as importantly, the defendants claim that there was gouge marks in the concrete, which, once again, it's a hunch or a guess or essentially speculation because there was nothing done to tie the gouge marks to the Honda. And, in fact, no debris was found on the scene. And if you once again look at the video, it shows that the lights of the car are fixed in one direction. There is no veer. And the ride-along himself says that when the car was coming straight, it was only Officer Troshi who claims that this veer took place. And this is after, if you look at the context of his testimony, he's saying he only opened up fire because it veered. So whether or not the car veered is something that is for a jury to determine, given that the physical evidence doesn't go to it, and there's an inconsistency or a conflict between what the ride-along says happened and what Officer Troshi said took place. Okay. Okay. Did you want to save some time for a rebuttal? Yes, Your Honor. Okay. Thank you. Good morning. May it please the Court. Joe Burke for the Appellees, the City of Hayward, and Officer Troshi. For the Court's request, I'd like to begin by discussing the case of Oren versus the City of Tacoma. The Oren Court upheld the denial of qualified immunity because there was admissible evidence, not blatantly contradicted by the record, which supported that the shooting officer and people in the vicinity were never under a legitimate fear for their lives. Oren is distinguishable from the present case on multiple grounds. Most significantly, Oren involved admissible evidence, which supported the version of events where an objectively reasonable officer had probable cause or did not have probable cause to believe that someone else or the officer themselves was under immediate threat of death or great bodily injury. Oren's admissible evidence included Oren's own testimony that Officer Clark, the shooting officer, was never in front of the car and that he ran to the passenger side of the car and shot into the passenger side from a position of safety. It's also undisputed in that case that the vehicle at the time was only moving five miles per hour. That's based on both officer testimony and Oren's own testimony. There was also a fellow officer's testimony that stated that Clark, the shooting officer, did not brace himself against the car for impact and that the shots took place after the car accelerated. So there was a dispute of whether the car was accelerating at the time of the shots or after, and that was supported by the testimony. Additionally, there was no physical evidence in that case that blatantly contradicted plaintiff's evidence. In the present case, there's no admissible evidence in the record that supports a version of events where Officer Troche did not have probable cause to believe that he or his ride-along passenger, Russell. Remember, when you're down into the qualified second prong and you're asking whether or not there's clearly established law and the officers are therefore entitled to qualified immunity, you have to take the version of the events, basically, according to the plaintiff. I agree. Unless there is evidence in the record that is so contradictory that you can't accept it. But the basic rule is you take he's a non-moving party, we can't get into the facts, or she wouldn't be up here on interlocutory appeal, so we have to take the events in a light most favorable to him. Correct, if there's facts in the record that support that version of the events. What about the bullet holes on the passenger in the side door? Is that a fact? Yes. So the bullet holes, at best, those show where shots may have come to rest. What's important about those photographs is without expert testimony, you cannot tell, a juror would not be able to tell where the shot came from, which shot out of the nine caused the actual seizure, where the officer was in relation to the car. Why do you need to establish which particular shot caused the seizure? Because that would be the physical force that was asserted. How about just firing the gun nine times? That's not a seizure? If it did not. If it didn't hit him? If it didn't hit him. Your position is if it didn't hit him, it's not a seizure? If it didn't hit him and if it didn't cause the vehicle to stop, then there would be no seizure. Got a case that supports that statement? Yes. Pointing a gun at somebody is not a seizure? Pointing a gun at someone is a seizure. What happened here? There's no evidence in the record that Officer Troche ever pointed the gun at the passenger. He pointed the gun at the car and he fired nine times. The record reflects that he focused his shots on the driver as the car approached him. So, additionally, the direction of the shots without expert testimony. Why do you need an expert to figure out the position of the bullet? The one on the side, it looks like it's going forward. Why does that take an expert to look at that? I mean, as a lay person, you can't look at that photograph and say, you know, the bullet's pointing direct, pointing forward. Right. Why do you need an expert to enlighten the juror? Well, because in this case, the suspect vehicle driven by Pac-Man was accelerating towards Officer Troche and Russell. And as Officer Troche backed pedal to get behind his patrol car, the suspect car also followed him, taking a right-hand turn, putting that side of the vehicle in front of Officer Troche as he fired. This happened very quickly, within two seconds. And you would need expert testimony to establish that under those conditions, a reasonable officer wouldn't be in fear of his life and would perceive that the right was over. That's a different kind of expert. You said that you needed an expert to determine the position of the vehicle, the position in which the bullet is pointing in the car. Thank you. The key issue here is whether officers… You know, there are ballistics experts, you know, ballistics, you know, the trajectory, and I've seen them in trial before where they come in and they testify. They have all their diagrams and their measurements and everything. Right. Yeah. And they're trying to position where the shot came from and whatnot. But if you're asking, if you look at the bullet, the position of the one bullet in the side, and I have a picture of it someplace. Let me see. I think it was… It's pretty clear if you just look at the photograph that the bullet is, you know, going forward. Well, that bullet… Which to a reasonable layperson would look like when the bullet was fired, that particular bullet, it was in the back of the car, shooting at the car. Well, that illustrates why an expert testimony is needed in this area. No, but you don't… Why do you need experts when you look at it? Well, first of all, that bullet… I don't know how you could possibly have that kind of location of a bullet if he was shooting it from the front. Well, that bullet clearly did not cause a seizure or any harm in this case. Now, as Officer Troche backpedaled behind his car and that suspect car followed him and pulled to the right, that would have put the passenger side… Let me ask you this, one other question. Yes. So I understand from the coroner's report that the bullet struck the victim from the neck. Is that right? That's incorrect. That's where I'm wrong? Yeah, the record reflects that. From which angle in the coroner's report? The coroner's report describes that the bullet entered the right shoulder of the passenger and traveled up through his neck. I'm sorry, through the shoulder though, here? Through his arm and upper shoulder. That would again suggest that the bullet was coming from the side, not from the front.  Where the passenger was positioned in the car, whether he was reaching for the steering wheel, whether he was ducking, there's just no way to tell. And there's nothing in the record that would reflect that position. And with the changing positions of both the shooter and the accelerating car, without an expert, it would be unclear as when the officer is supposed to stop feeling perceived threat. I haven't looked at Mr. Packman's deposition, but I will. Did Mr. Packman, did anybody ask him what was going on inside the vehicle at the time of the shooting? Appellant never deposed Packman. There is no testimony from Packman. In the city, the officer never deposed Packman? No one deposed Packman. And Packman's undisclosed subjective intent is irrelevant. Was Packman, well, you said that the passenger might be moving around. I'm just trying to figure out if there was any statements that he might have been twisting or he might have been reaching for the steering wheel. It's a possibility. It's not in the record. There's no indication of where he was in relation with the shooter or whether the shooter would still be under a reasonable threat at that time. Doesn't your city have a policy against shooting, discouraging officers from shooting at moving vehicles? The city does have a policy to discourage shooting at moving vehicles when possible because it's not effective typically. However, that policy does not establish a constitutional or statutory violation in this case, so there would be no Fourth Amendment violation. Could you just address for me, you know, the other thing the district court did besides denying qualified immunity was to say on the constitutional violation that there were no tribal issues of fact. Essentially saying there were no tribal issues of fact. How could that possibly be? Because there's no admissible evidence that isn't actually genuinely in dispute. The coroner's report, for instance, there's no foundation for that statement. It's complete hearsay. There's multiple layers of hearsay with that statement. Detective Hoyer was not at the scene of the shooting. We're not sure if the coroner wrote that statement down correctly. There's also other statements in there, like Pac-Man got out of his car, lit a cigarette, and he got back in, which are undisputed that that didn't happen. So where they got that information and how many layers of hearsay without any foundation, we can't say, but that's inadmissible, and the denial of a summary judgment can't be made on inadmissible information. Was the court right in equating the state law claims with the federal claim? In this case, yes. There's a different standard, no? There is a different standard. Negligence under California law is broader than the Fourth Amendment. What do you mean by broader? Broader as in it considers pre-shooting tactical decisions. However, in this case, where the only harm is the death caused by the shooting, and there's no special duty, there's no evidence in the record of any causation that would establish any negligent act beyond the shooting that would be a basis for a broader interpretation of negligence. So the finding that the officer acted reasonably in the shooting here under Penal Code Section 196 would be a justifiable homicide, and there can be no state law liability. One other issue on the coroner's report, that was never cited below, and the district court didn't have a duty under United States v. Kitspan Physician Services to comb through the record to look for any reason to deny this motion for summary judgment. I'm getting back to Oren. I just want to highlight that. Why do you say that the coroner's report, finding that the gunshot wound entered the right shoulder and traveled to the left side of the neck, is not evidence as to shooting from the side rather than in front? Because there were several shots to the front of the vehicle. I believe Appellant states there's one, but there's actually three. There's two to a windshield. You say that he might have been turning towards the – what evidence is there of that? There's no evidence that he was stationary, turned. We just don't know. It would cause speculation on the part of the jury to determine which direction that shot came from. Normally, if the passenger is sitting in the passenger seat with his seat belt on, his back is up against the back of the seat, right? That I would be speculating. I don't know if he had his seat belt on. Would you be speculating? Have you ever sat in a passenger seat with the seat belt on and not be touching the back of the seat? I would be speculating as if this certain individual was stationary, sitting while this whole incident went on. I can't say if he was sitting straight up. I would assume he wouldn't be if shots were being fired. Perhaps that's a material issue of fact to be tried? It would be if there was actual facts and evidence that established that, but there's a complete lack of evidence. I think if you look to the factual disputes appellant points out, they're either a complete lack. They're taking reasonable inferences from a lack of evidence or they're taking inferences from a subjective point of view of Pacman. Mr. Pacman could testify, couldn't he? Mr. Pacman could have testified. He could at a trial. He could testify at a trial. I don't know if he would testify against his conviction, and the state courts already found that there's a probable cause to both hold him over for assault. In answering my question, could he testify at the trial about what happened at the time of the shooting? He could. Sure. And his testimony would be fully admissible, correct? It could be. It could not be. Why wouldn't it be? It depends on what his testimony would be. He gets up there and relates what happened? It may be, it may not be. I mean, I guess it would have to depend on, you know, what objections were voiced at the time of trial. But I see my time is coming to a close. Okay. All right. Thank you, counsel. Thank you. Thank you. Would you address your colleague's comments that you have no admissible evidence that there was shooting from the side, that there wasn't any expert testimony that shows that there was shooting from the side or from the rear? Sure. We reject that position. We think there is evidence, competent admissible evidence to that effect that do not require an expert. And instead, a lay person can look, using their common experience and understanding that bullets go straight and they don't curve or reverse. And so the piece of the physical evidence that's in the record is the picture that shows that the gun was fired and the bullet struck the car from behind, going back to front and lodged in that car. On top of that, we have the coroner's report, as the court has pointed out, the way in which the gun wound, the bullet traveled through the body from left to right, I mean, from right to left. Why isn't the coroner's report here safe? Well, the report itself, we think, is a business record and should be admissible. However, we do have the coroner himself, who wrote the report, would be able to testify at trial as well. So that was in front of the court. We also have other evidence as well, as I mentioned in the video, because you can see the muzzle shots go off in the video and you can see the headlights of the car. They're fixed in a single direction, and you can tell from the muzzle shots kind of within the sequence that this took place. As well as there's also Pac-Man, the driver of the Honda, actually was interviewed by the police shortly after this incident, and that was also made available to the court. So we also have the defendants. Well, he could testify at trial. And he could testify at trial as well. He's been disclosed, and the defendants knew about him and had talked to him and interviewed him, actually. Also, the ride-along himself gave an interview as well as had his deposition taken and said when he was inside the car, after the supposed contact took place, of which Officer Troche says he didn't see it and didn't hear it. He says that's when the gun shots started and went off. So in the sequence of events, we have the supposed contact with the car that took place, which both the ride-along and the defendant officer are in dispute or in conflict about, and then the shots took place. Given where the officer said he was at, he was along the side of the car or at the tail of the car. That means that the car was essentially almost perpendicular to him, and given the physical evidence looking at those photos, you can see two bullet holes in the rear passenger side door as well as another bullet hole in the front passenger side door along the window area of that door, which is akin to where, unfortunately, the decedent was struck at and received his fatal injury. So we think there's ample evidence for a jury to reach a determination that the car was not an imminent threat when Officer Troche decided to use lethal force and that Officer Troche continued to use deadly force after the car was beyond his position and that this was a slow-moving car, given that Officer Troche was able to move from his claim, stay in front of the car, for a period of time all the way out until the car reached the street. And once again, the idea or what they're banking on is this mirror of the car, and it does not appear that that's a place either from the video or from the supposed damage to the patrol car door. Okay. Thank you, Counsel. We appreciate your arguments this morning. The matter is submitted at this point.
judges: Paez, Bea, Adelman